In re Estate of Boots: Boots, Appellant, v. Boots, and others, Respondents.

*No. 742 (1974). Submitted on briefs April 12, 1976.— Decided June 30, 1976.*
(Also reported in 243 N. W. 2d 225.)

For the appellant the cause was submitted on the brief of *McCarty, Curry, Wydeven, Asmus & Peeters* of Kaukauna.

For the respondent the cause was submitted on the brief of *Van Hoof, Van Hoof & Luebke* of Little Chute.

DAY, J. The order appealed from vacates a previous order for summary assignment of the Estate of James Boots, and requires Henry Boots (the principal beneficiary under the summary assignment) to turn over to an appointed special administrator all funds and income which he has received from two savings accounts jointly held by James and Henry Boots. The principal issues on appeal are whether the trial court erred in finding that (1) Henry Boots committed a constructive fraud in securing the original summary assignment and (2) the bank accounts were not, in fact, jointly owned with right of survivorship, but rather belonged entirely to James and hence became part of his estate.[1]

James Boots died intestate on November 23, 1971, at the age of 40. He was survived by two older brothers, Henry, age 57, and Franklin, age 50, three older sisters, Catherine Martzahl, Anna Lang, and Theresa Schreurs, and three children of a deceased brother, Richard, Sandra, and Timothy Boots. All of James' siblings are petitioners in the present case. An evidentiary hearing on their petition to appoint a special administrator established the following history:

During his lifetime, James Boots had resided with his father until the latter's death in 1955. Thereafter he resided briefly with his sister Theresa, and then with his sister Catherine until his own death. At Catherine's he occupied his own room, and paid room and board of $12 per week. He provided most of his own furniture and the family television set. James' schooling had stopped with the eighth grade. Catherine and Theresa testified that he had had difficulty when in school. He had been employed more or less constantly for about 15

---

[1] This case arose before enactment of ch. 291, Laws of 1973, creating ch. 705, Stats., dealing with multiple-party depository accounts.

years before his death as a truck driver by a local concrete products firm.

James' affairs were handled by his father until his death in 1955. After 1955, Catherine and, to a lesser extent, Theresa handled such things as James' auto insurance, driver's license, provision for clothes, and the medicines necessary for his heart condition. Catherine testified she had filled out various applications and medical forms because James "wasn't every good at spelling." Henry admitted he had never seen James reading a newspaper. Henry took over the management of James' financial affairs in 1957, when the first of the savings accounts was opened at Kimberly Savings & Loan Association in the names of "James Boots or Henry and Elizabeth Boots." All three of the parties went to the institution at that time. In 1970 when the Kimberly Credit Union account was opened, Henry went alone to pick up application materials because "that's the way he [James] wanted it." Henry also aided James in negotiating an automobile purchase and related loan in 1959, and supervised the filing of James' income tax returns by an attorney.

James contributed all of the funds to the joint accounts from his wages. He would sometimes give his paycheck to Henry for deposit in one of the accounts. Henry made all the deposits and all of the few withdrawals of funds as requested from time to time by James. Henry never withdrew funds for himself and never claimed any of the account dividends as taxable income. Henry admitted that the accounts were a "convenience" for James, but did state that they were supposed to go to him upon James' death.

There was also testimony that James was very shy and self-conscious about his weight of 350 pounds. He spent most of his spare time at home or in a local tavern, and avoided strangers. Henry admitted that James had never

gone with him to the savings and loan to make deposits in the joint account, because James shied away from such places.

Before James' death, the Boots family relationships were good. Catherine and Theresa both expressed their prior trust in Henry. Henry was no closer to James than he was to other members of the family.

On the day after James' funeral the first of a series of conferences among the members of the family occurred. A meeting of all concerned had been called to agree on the appointment of an administrator, but Henry privately advised his brother Franklin that there was no need for such a meeting. After some discussion Henry explained that the savings accounts were joint and now belonged entirely to him. The testimony is in conflict: Franklin testified that Henry had said, "don't get huffy about it. We can settle it all and divide it up even"; Henry testified that he had not said this at that time, although later he admitted that, after the summary assignment, he told Franklin the money could be divided equally. Franklin also testified that Henry had told everyone present "I'm going to take care of everything." This testimony was corroborated by Theresa. Henry denied making this statement. However, it was Henry who collected James' papers and sought out an attorney to handle the estate.

On December 2, 1971, Henry Boots filed a petition for summary assignment of James' estate pursuant to sec. 867.02, Stats.[2] The siblings were not formally noti-

---

[2] "867.02 **Summary assignment of small estates subject to claims of creditors.** (1) WHEN AVAILABLE. The probate court shall summarily assign the estate of a deceased person without the appointment of a personal representative whenever the estate less the amount of the debts for which any property in the estate is security, does not exceed $10,000 in value. . . ."

fied of the hearing on this petition, as is permitted by sec. 867.02 (2) (d).[3] The testimony indicates that there were numerous contacts between Henry and other members of the family, particularly Catherine and Franklin, prior to the hearing on Henry's petition. Henry admitted that he had told them little, if anything, about the administration of James' estate, although he admitted that he probably had been asked about the status of the estate. Franklin testified he had never been told anything by Henry about the estate, even though he had inquired "a good many times" about the hearing date. Catherine testified that Henry never told her of the nature or extent of James' savings or of the time for the hearing. She testified that she had specifically asked Henry's wife about the hearing date.

On February 29, 1972, Henry's petition for summary assignment was heard. The only testimony was that of Henry in support of the petition. An affidavit was introduced showing that James had assets of $13,004.28, of which $7,810.32 consisted of a one-half interest in two savings accounts, one held in joint form with Henry, the other with Henry and Henry's wife. The affidavit listed liabilities of $2,189.73. The affidavit did not show a $2,000 life insurance benefit paid by the Credit Union National Association to Henry as joint tenant in one of the savings accounts with the credit union. After the hearing, the trial court granted the petition for summary assignment, finding that the savings accounts were held by James and Henry as joint tenants.

---

[3] 867.02 (2) (d) "NOTICE. The court may hear the matter, including the proof of the will, without notice to interested persons or order notice to be given under s. 879.03. After the filing of the petition with the court, the petitioner shall publish notice to creditors as a class 1 notice, under ch. 985, in a newspaper published in the county."

The order of summary assignment was mailed on March 1, 1972, to all of the heirs. While the order identified by institution and account number the savings accounts which Henry had claimed as a joint tenant, the order did not state the amounts in the accounts or indicate that the $2,000 life insurance benefit had been paid to Henry. When his siblings discovered that Henry had been assigned the joint accounts, there were further discussions. Franklin testified that he could get no information from Henry, and went to the attorney to determine the amounts in the savings accounts. When confronted with Franklin's opinion that the matter had not been handled justly, Henry said he could give Franklin "up to $1000." Henry testified that he had mentioned $1000 in connection with a discussion of gift taxes. Catherine and her husband testified that Henry had told them he had not known that he would get the joint accounts until he had gone to the attorney. Henry denied making this statement and said he had only told them he didn't know whether he would, as a matter of grace, divide the joint accounts equally.

At the time of these discussions Henry prepared personal checks for $400 to each of his siblings to satisfy their complaints. Theresa had asked Henry why they could not find out how much there was in the accounts, and she testified that he replied, "It's personal" and "I don't want no trouble with my brothers and sisters . . . I'll get this mess straightened out." These checks were never cashed.

On about March 17, 1972, Henry delivered checks for $807 to each of his four siblings with written notes to three indicating that this was their share of James' savings; these checks were cashed. Franklin was still not satisfied and Henry admitted telling him that "I'll split it instead of having all this rigamarole about the money. Forget it."

On September 12, 1972, the present petitioners applied for intestate administration of James' estate. Henry asserted in opposition that the three-month statute of limitations barred reconsideration of the summary assignment.[4] The petitioners asserted that Henry had committed a fraud on the court, nullifying the earlier proceeding, and that the savings accounts were actually the sole property of James. On November 5, 1972, the evidentiary hearing was held at which the preceding testimony was given. Following the hearing, the trial court ruled that the earlier summary assignment proceeding could be reopened because, *inter alia,* Henry had committed constructive fraud. The court appointed Franklin Boots as special administrator.

*Constructive fraud.*

The first question is whether the order for summary settlement can be reopened for constructive fraud in its procurement. It is the position of Henry Boots that, three months having passed since a copy of the order assigning the estate was mailed or delivered to the petitioners, the order was *res judicata.* Henry Boots characterizes petitioners' action for intestate administration as a "collateral" attack on a prior adjudication.

[4] 867.02 (4) "RIGHTS OF CREDITORS AND PERSONS INTERESTED; STATUTES OF LIMITATION. . . . No action for the recovery of any property assigned in the proceeding or for the value of such property shall be brought by any creditor more than 3 months after the publication. No action for the recovery of any property assigned in the proceeding or for the value of such property may be brought by any person interested more than 3 months after a copy of the order assigning the estate was mailed or delivered to him, or if his name or post-office address could not have been ascertained by the exercise of reasonable diligence on the part of the petitioner, then more than 3 months after a copy of the order assigning the estate was mailed or delivered to any person interested."

This court has defined collateral attack as an "attempt to avoid, evade, or deny the force and effect of a judgment in an indirect manner and not in a direct proceeding prescribed by law and instituted for the purpose of vacating, reviewing, or annulling it." *Zrimsek v. American Automobile Ins. Co.* (1959), 8 Wis. 2d 1, 3, 98 N. W. 2d 383. He makes the assertion that the only basis for collateral attack is a claim that the trial court lacked jurisdiction, and that the petitioners' claim of fraud in the procurement of the order is not cognizable. In support of this proposition the appellant Henry Boots cites the case of *Cody v. Cody* (1898), 98 Wis. 445, 452, 74 N. W. 217, wherein this court said:

"As to the numerous allegations charging fraud and imposition on the part of *William G. Cody,* both upon his father, upon Mr. Sanborn, and upon the court, it is very plain that none of them can affect the question of jurisdiction. A judgment may be procured by the grossest fraud, and yet be within the undoubted jurisdiction of the court which renders it. Upon collateral attack, the question is not whether the judgment was obtained by fraud, but whether it was rendered without jurisdiction."

This statement was quoted in *Werner v. Riemer* (1949), 255 Wis. 386, 403, 39 N. W. 2d 457, and *Kehl v. Britzman* (1951), 258 Wis. 513, 517, 46 N. W. 2d 841, neither of which involved allegations of fraud in the procurement of the prior judgment. *Werner* specifically noted, at p. 401, that the only allegations of fraud had been litigated in the original action, and that in any case there was no actionable fraud. *Kehl* noted that no fraud was even alleged. *Cody* was also cited in *Vaughn v. Walsh* (1904), 122 Wis. 486, 490, 100 N. W. 840, another case where no fraud was alleged; the court, however, noted that a judgment is binding "until set aside in a direct proceeding for fraud or for some other reason recognized by the law."

The rule as expressed in *Cody* and *Vaughn* is no longer the law in this state. In *Zrimsek, supra,* at page 3, this court said:

"The general rule is stated in 49 C. J. S., Judgments, p. 792, sec. 401, as follows:

" 'A judgment rendered by a court having jurisdiction of the parties and the subject matter, unless reversed or annulled in some proper proceeding, is not open to contradiction or impeachment, in respect of its validity, verity, or binding effect, by parties or privies, in any collateral action or proceeding, except . . . for fraud in its procurement.' "

This reference was quoted with approval in *Kriesel v. Kriesel* (1967), 35 Wis. 2d 134, 139, 150 N. W. 2d 416, and *Sinnott v. Porter* (1973), 57 Wis. 2d 462, 466, 204 N. W. 2d 449. This rule has been recognized as the Wisconsin law in the case of *Capitol Indemnity Corp. v. St. Paul Fire & Marine Ins. Co.* (W. D. Wis. 1972), 357 Fed. Supp. 399, 410.

Petitioners argue that their attack on the original order is direct rather than collateral. However, in view of the law in Wisconsin that fraud is a ground for collateral attack, that issue need not be examined. *Compare State Central Credit Union v. Bayley* (1967), 33 Wis. 2d 367, 147 N. W. 2d 265; *Estate of Hatzl* (1964), 24 Wis. 2d 64, 69–71, 127 N. W. 2d 782.

The second question is whether a constructive fraud was committed on the court in this case. In the case of *Parsons v. Balson* (1906), 129 Wis. 311, 317, 109 N. W. 136, a New York case was cited which held that:

" 'Fraud, in law, is of two kinds—actual and constructive. The former arises from deception practiced by means of the misrepresentation or concealment of a material fact; the latter, from a rule of public policy, or the confidential or fiduciary relation which one of the parties affected by the fraud sustained towards the other. It is a constituent of actual fraud that the party alleged

to have been defrauded was deceived. . . No positive dishonesty of purpose is required to show constructive fraud.' "

Other cases in Wisconsin have dealt with the question of constructive fraud, mostly relating to the acts of fiduciaries. In *Will of Cosgrove* (1941), 236 Wis. 554, 295 N. W. 784, a trustee's unrevealed self-dealing in real property was found to be a constructive fraud on the court. In *Parsons, supra,* a guardian *ad litem* had negligently failed to bring critical facts to the court's attention. In *Estate of Poulson* (1972), 54 Wis. 2d 139, 194 N. W. 2d 593, an executor's action was involved.

Henry Boots, through his own actions in this case, stood in a fiduciary relationship to his brothers and sisters. It was he who collected James' papers, contacted an attorney, and maintained an exclusive relationship with that attorney. It is apparent that his siblings relied upon him as their older brother for information, and trusted him to treat them in a fair manner. The trial court found that there had been at least a constructive fraud in this case. The trial judge said that the only reason that prevented him from being convinced that Henry was "flagrantly guilty of actual fraud" is because of Henry's lack of understanding. The court found that Henry had withheld information concerning the estate, and particularly the amount of money in the accounts, in spite of numerous protests. Henry had given his siblings reason, both orally and by monetary payments, to believe that he would divide the proceeds fairly. Henry attempts to argue against the trial court's determination of constructive fraud, citing that Franklin was told of the joint savings accounts the day after the funeral, even though not told of the amounts involved, and that the full status of the estate was known about a month after the summary assignment, which was two months before the statute of limitations expired. This is not sufficient

to overcome the trial court's findings, in view of Henry's several assurances that the matter would be handled equitably. On appeal this court will not reverse the findings of a trial court unless they are against the great weight and clear preponderance of the evidence. *Milbauer v. Transport Employees Mut. Ben. Society* (1973), 56 Wis. 2d 860, 203 N. W. 2d 135. The evidence here clearly supports the trial court's findings of constructive fraud, and the prior summary assignment proceeding was, therefore, properly vacated.

Henry Boots also argues that acceptance of the $807 checks by his brothers and sisters constituted a "ratification" of any constructive fraud he may have committed, estopping them from complaining. He cites *Cosgrove, supra,* but that case contains the refutation of his argument. The court there refused to find that petitioners' signatures appointing an agent constituted ratification where petitioners had no knowledge of the agent's previous fraud at the time the signatures were given. In the present case, Henry's siblings had some knowledge of his actions, but were attempting to remedy his behavior, not to ratify it, by accepting the checks. The checks were, in connection with Henry's assurances of fair play, a part of the continuing act of constructive fraud. They were not a final settlement agreed to by his siblings.

*Survivorship rights.*

The final question is whether the trial court erred in finding that James did not intend that Henry have a right of survivorship. The presumption is that a right of survivorship was intended in the setting up of a joint account. *Estate of Michaels* (1965), 26 Wis. 2d 382, 390, 391, 132 N. W. 2d 557. This presumption must be overcome by evidence which is "clear and satisfactory."

The finding of the trial court here that there was no intent on the part of James to establish such right of survivorship is not against the great weight of the evidence. The court pointed out that there was not a scintilla of evidence that James intended to give substantially all of his estate to Henry rather than to anyone else, or that James had any understanding of the survivorship aspects of a joint account. Indeed, the court found it doubtful that James was capable of understanding this. The court pointed out his dependence on other members of his family to assist him in routine transactions. First there was dependence on his father, then on Henry for financial counseling, as well as dependence on two of his sisters for assistance in even the simplest transactions. The use of joint accounts was the result of James' dependence, and shows only an intent to confer a power of agency on Henry, and no intent to give the bulk of his estate to Henry alone. Henry admitted that the accounts were established for James' convenience. Although Henry testified that at the time the joint accounts were set up, he understood that he was to have the balance in the account on his brother's death, Catherine and her husband testified that he had told them he knew nothing about his survivorship rights until consulting an attorney. In weighing these conflicting statements, the trial court as finder of fact could properly accept the latter version, which is inconsistent with any survivorship right.

■ The finding of the trial court that these were not true joint accounts with an attendant right of survivorship, but were established solely as a matter of convenience for James, both as to the method of depositing and withdrawing sums from his account, is not against the great weight of the evidence. *See: Johnson v. Mielke* (1970), 49 Wis. 2d 60, 76–79, 181 N. W. 2d 503.

This court must therefore sustain the finding of the trial court. *Milbauer, supra.*

*By the Court.*——Order affirmed.