STATE of Wisconsin, Plaintiff-Respondent,

v.

Justin D. GUDGEON, Defendant-Appellant.†

Court of Appeals

*No. 2005AP1528. Oral argument April 13, 2006.*
*—Decided June 14, 2006.*

2006 WI App 143

(Also reported in 720 N.W.2d 114.)

† Petition to review denied 9-11-06.

189

190

On behalf of the defendant-appellant, the cause was submitted on the briefs of and oral argument by *Jefren E. Olsen*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *James M. Freimuth*, assistant attorney general. There was oral argument by *James M. Freimuth*.

Before Brown, Nettesheim and Anderson, JJ.

¶ 1. BROWN, J. In this case, the circuit court made known in writing that it wanted Justin D. Gudgeon's probation extended before the extension hearing even took place. Gudgeon claims that the court was therefore biased in favor of a particular result before listening to the evidence. The State counters that Gudgeon's claim is a collateral attack since he never appealed the extension order and did not even appeal a subsequent probation revocation. We agree, but one exception to the prohibition on collateral attack is if the tardy petition was due to newly discovered evidence. This may be the case here, and we remand with directions that the circuit court hear whether the evidence was newly discovered. If the circuit court so holds, then we direct the circuit court to vacate the extension order on grounds of judicial bias and order a new extension hearing. We further offer to our supreme court the thought that judicial bias is the type of structural error that should afford relief by collateral attack in the same manner as claims alleging lack of counsel.

¶ 2. On August 24, 2000, Gudgeon was convicted for operating a vehicle without the owner's consent. This judgment of conviction arose from an incident in which Gudgeon took off with another individual's motorcycle and attempted to flee from police. After Gudgeon abandoned the motorcycle in a ditch, one of the

193

officers in pursuit accidentally ran into it. The bike was destroyed. Accordingly, the judgment of conviction called for restitution of $8425 to the owner as a condition of Gudgeon's probation.

¶ 3. On May 15, 2002, Gudgeon's probation agent sent a letter to the court. The agent noted that Gudgeon's condition time was about to expire and that because of other charges, he was in custody and did not have the option of work release. She indicated that Gudgeon might not be available for supervision if convicted on pending charges from out of state and noted that he still owed $7834.53 in restitution. She proposed the following:

> Rather than simply extend Mr. Gudgeon's supervision, I am respectfully asking that the court convert the court obligations to a civil judgement [sic]. Such a judgement [sic] would generate interest for the victim while simply extending supervision would not. In addition, as previously noted, Mr. Gudgeon may not be available to earn money in the community if convicted in Illinois.

In reply, Judge Michael S. Gibbs handwrote at the bottom of the letter, "No—I want his probation extended" and sent copies to the probation agent, the district attorney, and Gudgeon's last attorney of record.[1]

¶ 4. An extension hearing took place on August 21. The State pointed out that Gudgeon had outstanding restitution, and the court, Judge Gibbs presiding, asked Gudgeon how much he had paid. Gudgeon could not remember, but his agent stated that he had paid a

---

[1] The letter to the court was addressed to Judge James L. Carlson, but due to rotation, Judge Gibbs responded to the letter.

total of $620, after which the court inquired whether Gudgeon had been working. Gudgeon replied that he had not because he had been in custody. The court responded by asking, "And why is it that you don't think you should have to pay this restitution?" Gudgeon stated that he did think he should have to pay and that he intended to do so but that the amount was "not pocket change." The following colloquy ensued:

> THE COURT: All right. That's right. It's not pocket change to the victim either. The only way I can see where we can make sure you are going to pay is to keep the hammer over your head, give you an incentive to pay it; otherwise, I don't believe you will. You said that you want to pay it. You said you intend to pay it. I'm going to make sure you pay it.
>
> Your probation is going to be extended for two years. If you pay that off, you get off supervision. The sooner you pay it off, the sooner you get off probation.
>
> THE DEFENDANT: What happens if I go to jail? Then I get revoked and have to go through the whole process again.
>
> THE COURT: We'll see what happens. That's then. You got to pay your restitution. And you had a six-month stayed sentence, so you did something to get yourself locked up. You could have been working.
>
> THE DEFENDANT: I was working at the time.
>
> THE COURT: You could have been working, but instead you were doing something to get this alternative to revocation as an additional six months or had to do your stayed time. So I don't feel sorry for you. You have to take this real seriously. Get on it and get it done. If you want to get off probation, pay that. I'd do it fast if I were you.

195

¶ 5. Gudgeon did not appeal the extension. In May 2003, his probation was revoked because of violations, and the court sentenced him. He did not appeal that revocation and sentence either. Instead, he brought a motion for postconviction relief, pursuant to Wis. Stat. § 974.06 (2003–04).[2] He alleged that his due process rights had been violated during the extension proceedings because the presiding judge was not a neutral magistrate. Gudgeon read the court's handwritten notation on the letter from his probation agent as prejudging his case with respect to whether to extend probation. He also viewed some of the court's language at the hearing as evidence that the court was actually influenced by this bias. The postconviction court denied relief, and Gudgeon appeals.

¶ 6. We first determine whether we can even reach the merits of Gudgeon's challenge. As the State points out, Gudgeon never appealed from the extension order. We recognize that courts generally disfavor collateral challenges because they disrupt the finality of prior judgments and thereby " 'tend to undermine confidence in the integrity of our procedures' and inevitably delay and impair the orderly administration of justice." *See Custis v. United States*, 511 U.S. 485, 497 (1994) (citation omitted) (refusing to allow collateral attack on a conviction at a sentence enhancement proceeding); *State v. Hahn*, 2000 WI 118, ¶¶ 26–28, 238 Wis. 2d 889, 618 N.W.2d 528 (following *Custis*), *modified on other grounds*, 2001 WI 6, 241 Wis. 2d 85, 621 N.W.2d 902; *Boots v. Boots*, 73 Wis. 2d 207, 216, 243 N.W.2d 225 (1976) (general rule precludes attacking a

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

judgment in a collateral proceeding unless judgment was procured by fraud). Moreover, this disruption occurs in independent proceedings intended for different purposes. *Custis*, 511 U.S. at 497; *Hahn*, 238 Wis. 2d 889, ¶¶ 26–27.

¶ 7. Despite this general bar on collateral attacks, the law does recognize exceptions. In *Hahn*, our supreme court followed the United States Supreme Court's holding in *Custis*, which established that the federal constitution does not require the courts to permit collateral attacks on a judgment of conviction used for sentence enhancement purposes unless the defendant's challenge is based on a lack of counsel in the prior proceeding. *See Custis*, 511 U.S. at 496; *Hahn*, 238 Wis. 2d 889, ¶¶ 23–29. *Custis* observed that a court's failure to appoint counsel for an indigent defendant was a "unique constitutional defect," *Custis*, 511 U.S. at 496, reasoning that "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel," *id.* at 494–95 (alteration in original; citation omitted). In limiting collateral attacks to those challenges raising the right to appointed counsel, *Custis* and *Hahn* invoked the policy of finality discussed above. *See Custis*, 511 U.S. at 497; *Hahn*, 238 Wis. 2d 889, ¶¶ 26–27. They also invoked administrative concerns relating to fact finding, noting that resolving many constitutional challenges would require the court in a pending proceeding to rely on records from other courts, which the court may not have. *See Custis*, 511 U.S. at 496; *Hahn*, 238 Wis. 2d 889, ¶¶ 24–25. Presumably, figuring out whether an individual was represented by counsel in a prior proceeding would not require extensive fact finding.

197

¶ 8. We cannot use *Hahn* to decide whether to absolve Gudgeon of his collateral attack problem for the simple reason that we are an error-correcting court and it is for our supreme court, as our judicial administration policymaking body, to make that decision. *See Cook v. Cook*, 208 Wis. 2d 166, 188–89, 560 N.W.2d 246 (1997). Nonetheless, in the following paragraphs, we will explain why we believe it would be a wise decision for the supreme court to expand *Hahn* to the situation at bar.[3]

¶ 9. We are persuaded that the deprivation of an impartial and unbiased tribunal warrants an exception to the general prohibition of collateral attacks just as does the situation where a person allegedly was not afforded counsel. First, we examine what makes the deprivation of a right to counsel "unique." Although *Custis* never used the term, we note that the Court has recognized the total deprivation of counsel as a "structural error." *See Neder v. United States*, 527 U.S. 1, 8 (1999). A "structural error" is one so fundamental that the courts consider it per se prejudicial and do not apply a harmless error analysis. *Id.* They differ in magnitude from other constitutional errors because they are "defect[s] affecting the framework within which the trial proceeds, rather than simply . . . error[s] in the trial process itself." *Id.* (citation omitted). These defects "infect the entire trial process" because they "depriv[e] defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle

---

[3] Prior to oral argument, we did ask the parties to be prepared to discuss this issue and the subject was explored during arguments.

for determination of guilt or innocence' " and thereby "render a trial fundamentally unfair." *Id.* at 8–9 (citations omitted).

¶ 10. A biased tribunal, like the lack of counsel, constitutes a "structural error." *See id.* at 8; *Franklin v. McCaughtry*, 398 F.3d 955, 961 (7th Cir. 2005); *State v. Carprue*, 2004 WI 111, ¶ 59, 274 Wis. 2d 656, 683 N.W.2d 31. Indeed, common sense dictates that the whole point of having counsel is to help the defendant present the facts and the law to the tribunal in the light most favorable to the defendant. Such a presentation becomes worthless when the court has already made up its mind as to the outcome. *See Custis*, 511 U.S. at 494–95 (discussing right to counsel in terms of "right to be *heard*" (emphasis added)); *cf. Neder*, 527 U.S. at 8 ("[I]f the defendant had counsel *and was tried by an impartial adjudicator*, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." (Citation omitted; alteration in original; emphasis added.)).

¶ 11. Our supreme court has also on occasion iterated the importance of an impartial tribunal. *Guthrie v. WERC*, 111 Wis. 2d 447, 331 N.W.2d 331 (1983), involved an appeal from an administrative decision. The former assistant attorney general had represented WERC in a 1974 appeal to the circuit court. *Id.* at 448–49. Three years later, during later proceedings following remand, this same individual—now a commissioner—drafted WERC's decision on the merits. *Id.* at 448–50. The supreme court agreed with this court and the circuit court that the commissioner should have disqualified himself. *See id.* at 451–54. The court stated, "It is, of course, undisputable that a *minimal rudiment* of due process is a fair and impartial decisionmaker." *Id.*

199

at 454 (emphasis added). "[A] 'fair trial in a fair tribunal is a basic requirement of due process.' " *Id.* at 454 (citation omitted).

¶ 12. The court echoed these thoughts in *Marris v. City of Cedarburg,* 176 Wis. 2d 14, 498 N.W.2d 842 (1993). That case involved an appeal from a zoning board decision in which the chairman had made remarks indicating he had prejudged the question of whether a landowner's property had lost its legal-nonconforming-use status prior to the actual hearing. *Id.* at 19–20, 27–28. The court held that the board must rehear the matter without the chairman. *Id.* at 31. It explained that, "Since biases may distort judgment, impartial decision-makers are needed to ensure both sound fact-finding and rational decision-making as well as to ensure public confidence in the decision-making process." *Id.* at 25–26. Thus, when an individual attacks a former proceeding on the basis of judicial bias, we see as compelling a reason for overriding finality as when the challenge is based on the failure to appoint counsel.

¶ 13. We further note that this case also does not present any fact-finding difficulties. We have a complete record before us. Indeed, the communication to which Gudgeon objects is in the court's own handwriting.

¶ 14. Based on the foregoing, if it were our decision to make, we would extend *Hahn* to this case. As we said earlier, however, it is not in our power to break new ground in this area. First, certain language in *Hahn* indicates that we need bright-line rules. "Although these administrative considerations may weigh differently in different cases, we conclude that considerations of judicial administration favor a bright-line rule that applies to all cases." *Hahn,* 238 Wis. 2d 889, ¶ 28. Whether a judge was biased will often require more fact-finding than is present here. Thus, although we are

200

convinced that the structural error is serious enough to justify an exception to the prohibition on collateral challenges, we cannot be positive the supreme court would endorse an expansion of *Hahn* for judicial bias cases. Indeed, although *Neder* identified roughly half a dozen types of structural error, *see Neder*, 527 U.S. at 8 (lack of counsel, judicial bias, racial discrimination in jury selection, denial of self-representation at trial, denial of public trial, defective reasonable-doubt instruction), *Custis* and *Hahn* only singled out absence of counsel as a basis for allowing collateral attacks.

¶ 15. Second, as we have noted already, this court is primarily an error-correcting court. *See Cook*, 208 Wis. 2d at 188. Making a determination about whether to expand *Hahn* to encompass judicial bias challenges requires a delicate balancing of public policy considerations more appropriate to the supreme court's function of defining and developing the law. *See id.* at 189. Accordingly, this court will not leap first.

¶ 16. But having set aside the idea of adopting a *Hahn*-type exception to cases alleging judicial bias, we still need to discuss this case based on the issues as they were framed to us in the briefs and during oral argument. We do so now.

¶ 17. The parties, *citing State ex rel. Booker v. Schwarz*, 2004 WI App 50, 270 Wis. 2d 745, 678 N.W.2d 361, agree that the law also recognizes newly discovered evidence as an exception to the general prohibition of collateral challenges. The point of dispute between the parties appears to be a factual one, namely, whether Gudgeon's claim of judicial bias stems from newly discovered evidence, most notably the letter containing the court's handwritten message. The test for newly

201

discovered evidence contains five elements.[4] In order to satisfy this test, the moving party must show that: (1) the party learned of the evidence after the relevant proceeding; (2) the party was not negligent in seeking to discover it; (3) the evidence must not be merely cumulative to other evidence adduced; (4) the evidence must be material to the issue before the court; and (5) it must be reasonably probable that a different result would be reached in a new proceeding. *See id.*, ¶ 12.

¶ 18. The first three elements are completely factual; since we are not a fact-finding court, we remand to the circuit court with directions that it hear whether Gudgeon meets these elements. The court should consider not only the court's written notation but also any evidence separate and apart from the note that Gudgeon might have had about the court's apparent prejudgment of the case. For example, the limited state of the current record reveals that after the trial court penned the notation, "No—I want his probation extended," Gudgeon's probation officer wrote to the trial court advising that Gudgeon had refused to sign papers agreeing to an extension of probation. Thus, the circuit court should examine what, if anything, the probation officer communicated to Gudgeon as to the trial court's stance on the extension question.

[4] In its brief the State appeared to suggest that Gudgeon did not timely raise the issue of newly discovered evidence, presumably because he never raised it in the circuit court. Our review of the record reveals, however, that the State never argued Gudgeon's challenge was an impermissible attack. Thus, Gudgeon had no reason to invoke the newly discovered evidence exception. Accordingly, we reject any suggestion that Gudgeon waived the issue.

¶ 19. We will now address the fourth and fifth elements of the newly discovered evidence test. We need not dwell on the fourth. It is obvious that evidence, such as the court's note, indicating that the judge was predisposed to a particular outcome is material to a judicial bias claim. The fifth element deals with the probability that the result would have been different, and this court is in just as good a position as the circuit court to answer that question. *See State v. Pepin*, 110 Wis. 2d 431, 435–36, 328 N.W.2d 898 (Ct. App. 1982) (appellate review generally justified where trial court has no advantage in addressing the question); Ronald R. Hofer, *Standards of Review—Looking Beyond the Labels*, 74 MARQ. L. REV. 231, 237–39 (1991) ("labels of 'fact' and 'law' " are little more than measures of deference to trial court; deference unnecessary where trial court not in a "better position" to decide the question); *Estate of Schultz v. Schultz*, 194 Wis. 2d 799, 807–08, 535 N.W.2d 116 (Ct. App. 1995) (citing *Pepin* and Hofer).

¶ 20. Simply put, if the trial court finds as a factual matter that evidence of the court's partiality was newly discovered, then the issue boils down to whether the note exhibits judicial bias. When analyzing a judicial bias claim, we always presume that the judge was fair, impartial, and capable of ignoring any biasing influences. *See Franklin*, 398 F.3d at 959. That presumption, however, is rebuttable. *Id.* at 960. The test for bias comprises two inquiries, one subjective and one objective. *Id.* Either sort of bias can violate a defendant's due process right to an impartial judge. *Id.*; *State v. Walberg*, 109 Wis. 2d 96, 105–06, 325 N.W.2d 687 (1982). Judges must disqualify themselves based on subjective bias whenever they have any personal doubts

as to whether they can avoid partiality to one side. *Id.* The parties agree that this sort of bias is not at issue here.

■

¶ 21. The second component, the objective test, asks whether a reasonable person could question the judge's impartiality. *Franklin*, 398 F.3d at 960; *Walberg*, 109 Wis. 2d at 106–07 (looks to whether impartiality can "reasonably be questioned"). Actual bias on the part of the decision maker certainly meets this objective test. *In re Murchison*, 349 U.S. 133, 136 (1955); *Franklin*, 398 F.3d at 960–61. Sometimes, however, the appearance of partiality can also offend due process:

> [O]ur system of law has always endeavored to prevent even the probability of unfairness . . . . "[E]very procedure which would offer a possible temptation to the average man [or woman] as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Tumey v. Ohio,* 273 U.S. 510, 532 [(1927)]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14 [(1954)].

*Murchison,* 349 U.S. at 136.

¶ 22. We have reviewed numerous cases, both state and federal, that discuss these two aspects of objective bias. Initially, we had a difficult time discerning from them whether actual bias was necessary or merely sufficient. Several cases indicated that the former was true, that apparent bias did not suffice to establish a due process violation. *See, e.g., Cartalino v. Washington,* 122 F.3d 8, 11 (7th Cir. 1997); *State v.*

*O'Neill*, 2003 WI App 73, ¶¶ 11–12, 261 Wis. 2d 534, 633 N.W.2d 292 (objective test asks whether objective facts reveal actual bias; "It is not sufficient to show that there is an appearance of bias or that the circumstance might lead one to speculate that the judge is biased."); *State v. McBride*, 187 Wis. 2d 409, 417, 523 N.W.2d 106 (Ct. App. 1994) ("While the record provides an ample basis for the judge's conclusion that there would be the appearance of partiality, it does not demonstrate that Judge Koehn was actually biased."); *Harvey v. State*, 751 N.E.2d 254, 259–60 (Ind. Ct. App. 2001). Other precedents stated the contrary. *See e.g., Walberg*, 109 Wis. 2d at 109; *Murchison*, 349 U.S. at 136 (see language quoted above that sometimes judge without actual bias must be recused); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986); *Bracy v. Schomig*, 286 F.3d 406, 411 (7th Cir. 2002) ("ordinarily 'actual bias' is not required, the appearance of bias is sufficient to disqualify a judge"). On its face, the law appeared to be hopelessly contradictory.

¶ 23. Further examination, however, reveals that this divergent case law can be harmonized. Those cases that recognized appearance of partiality as sufficient seemed to do so only where the apparent bias revealed a great risk of actual bias. The Eighth Circuit's opinion in *Jones v. Luebbers*, 359 F.3d 1005, 1012–13 (8th Cir. 2004), *cert. denied,* 543 U.S. 1027 (2004), is particularly illuminating. Upon setting forth the *Murchison* rule that apparent bias can violate due process, the court goes on to observe how the application of *Murchison* has varied depending on context. *Jones*, 359 F.3d at 1012–13. According to *Jones*, for certain manifestations of judicial bias—such as taking bribes or presiding over contempt proceedings arising out of alleged misconduct that occurred in front of the presiding judge in closed

chambers—*Murchison* will nearly always require disqualification. *Jones*, 359 F.3d at 1012–13. *See also Cartalino*, 122 F.3d at 11 (observing some temptations are so severe, one can safely presume a substantial biasing incentive, such that "a demand for further evidence would be otiose").

¶ 24. In other cases, *Jones* teaches that we determine whether "the potential for bias is sufficiently great" to sway the average person serving as judge away from neutrality, assessing that risk in light of a realistic consideration of "psychological tendencies and human weaknesses." *Jones*, 359 F.3d at 1013 (citation omitted). *See also State v. Harrell*, 199 Wis. 2d 654, 666, 546 N.W.2d 115 (1996) (Abrahamson, J., concurring); *cf. Marris*, 176 Wis. 2d at 25 (employing similar language in light of common-law due process mandates: due process violated "when there is bias or unfairness in fact [or when] the *risk* of bias is impermissibly high" (emphasis added; footnote omitted)). In short, the appearance of bias offends constitutional due process principles whenever a reasonable person—taking into consideration human psychological tendencies and weaknesses—concludes that the average judge could not be trusted to "hold the balance nice, clear and true" under all the circumstances.

¶ 25. Applying these standards, we first consider whether there was actual bias. Again, we must presume that the court acted impartially. Although a judge who has prejudged the facts or the law cannot decide a case consistent with due process, a judge who merely expresses a general opinion regarding a law at issue in the case does not offend due process. *Franklin*, 398 F.3d at 962. The State argues that this case more closely

resembles the latter scenario, asserting that the court's note merely revealed the judge's general feeling that it would not be appropriate to outright grant the probation agent's request for a civil judgment without exploring the option of probation extension. This inference is certainly reasonable. Members of this panel have served as trial judges, and we recognize that a trial judge receives numerous requests of various sorts every day. Often, there is not enough time to carefully consider each of these administrative matters, and the court often ends up making snap judgments, accompanied by off-the-cuff, sometimes handwritten responses. These responses are frequently curt, telegraphic, and inartfully worded. We cannot conclude that the court's notation on the letter persuasively establishes actual bias in and of itself given our experience and the reputation of this particular trial judge as a fair and just administrator of the law.

¶ 26. The appearance of partiality, however, remains problematic. We must resolve this case based on what a reasonable person would conclude from reading the court's notation, *id.* at 960, not what a reasonable trial judge, a reasonable appellate judge, or even a reasonable legal practitioner would conclude. The court here used strong language. "*I want* his probation extended." (Emphasis added.) "Want" signifies a personal desire on the court's part. Of additional significance, this expressed desire refers not to an extension *hearing*—at which to decide the merits of extension versus a civil judgment—but to the extension itself, an ultimate outcome. Neutral and disinterested tribunals do not "want" any particular outcome. Moreover, a reasonable person familiar with human nature knows that average individuals sitting as judges would prob-

ably follow their inclination to rule consistently with rather than against their personal desires. The ordinary reasonable person would discern a great risk that the trial court in this case had already made up its mind to extend probation long before the extension hearing took place. Further, nothing in the transcript of the extension hearing would dispel these concerns. We therefore agree with Gudgeon that the extension hearing violated his due process right to an impartial tribunal.

¶ 27. Having concluded that the circuit court was not objectively impartial, we now turn to what remedy the trial court should employ on remand should it find that Gudgeon has met the first three elements for newly discovered evidence. Gudgeon essentially claims that because the extension was a legal nullity and his probation ended, the courts no longer have jurisdiction to extend his probation. Thus, he should go free. The State, on the other hand, argues that Gudgeon should merely get a new extension hearing.

¶ 28. We agree with the State. Our supreme court in *Huggett v. State*, 83 Wis. 2d 790, 266 N.W.2d 403 (1978), employed in a similar case the very procedure the State advocates here. Huggett had failed to make all of the restitution payments she owed while on probation, and the circuit court had extended her probation period by two years. *Id.* at 792–95. Following the extension, Huggett violated her probation by absconding from the state. *Id.* at 795. Huggett's probation was revoked, and she was incarcerated. *Id.* She subsequently sought postconviction relief, arguing that the extension of probation was improper because it was premised solely on her inability to pay restitution. *Id.* at 795, 799. According to Huggett, because the Depart-

208

ment of Corrections had no justifiable basis for the extension, she was "not properly on probationary status at the time she left the state." *Id.* at 799. The court confirmed that failure to pay restitution was not "cause" for extending probation if an indigent probationer had made a good-faith effort to pay. *Id.* at 803. Thus, it concluded that the real controversy—whether cause existed for extension—had not been fully tried and remanded the case to the trial court to decide the cause issue. *Id.* at 802–04.

¶ 29. Obviously, the original term of Huggett's probation had long been over by the time the supreme court ordered the retroactive hearing to determine cause. We have the same situation here. Moreover, in both this case and *Huggett*, the extension hearing resulted in an invalid extension. We see no reason not to follow the same procedure as in *Huggett*. Indeed, we observed in *State v. Sorenson*, 152 Wis. 2d 471, 498, 449 N.W.2d 280 (Ct. App. 1989), that retrospective hearings have been used in a variety of cases. If the court determines on remand that cause to extend probation did exist, the sentence after revocation will stand. Otherwise, it should release Gudgeon and reduce his restitution to a civil judgment.

¶ 30. We reverse the decision of the circuit court. Although *we* may be convinced that the circuit court was not prejudging the extension issue, that is not the test. The risk of bias that the ordinary reasonable person would discern—which is the test—is simply too great to comport with constitutional due process. Gudgeon normally would not be entitled to a remedy, given the general prohibition on collateral challenges. That said, if he can demonstrate to the circuit court that the basis for his judicial bias claim arises from newly discovered evidence, the court must give him a new

extension hearing at which it will determine whether cause existed for the extension. If so, Gudgeon has no further recourse; if not, probation ended and the court must reduce the restitution to a civil judgment.

¶ 31. Moreover, we reiterate our view that the supreme court ought to expand *Hahn* to recognize an additional exception to the bar on collateral attacks for challenges premised upon judicial bias. When a tribunal predetermines how it will rule, the error is structural and poisons the entire proceeding. This structural defect offends due process at least as much as the lack of counsel; unless the tribunal listens disinterestedly to what both parties have to say, defense counsel becomes little more than courtroom decor. The right to counsel presupposes a fair and impartial judge.

*By the Court.*—Order reversed and cause remanded with directions.