DAVID T. PROSSER, J.
¶ 69. (concurring). I agree with the bottom line of the lead opinion. On the basis of the facts set out in the lead opinion, I have no difficulty in concluding that the sentencing judge in this case was not biased against the defendant and that a reasonable person, fully apprised of the facts in the record, would not reach a different determination.
¶ 70. I do not join the lead opinion because it relies on three cases, State v. Gudgeon, 2006 WI App 143, 295 Wis. 2d 189, 720 N.W.2d 114; State v. Goodson, 2009 WI App 107, 320 Wis. 2d 166, 771 N.W.2d 385; and Caperton v. A. T. Massey Coal Co., 556 U.S. 868 (2009), that tend to confuse and undermine the administration of justice.
¶ 71. These cases create "objective" tests of bias that are so loose and vague that they are almost impossible for courts to apply in a fair and consistent manner. Consequently, these tests can be manipulated by parties, manipulated by non-parties, and manipulated by judges, to achieve some desired result. This manipulation is not law; it is gamesmanship.
*366 ¶ 72. Because the lead has pointed to Gudgeon, Goodson, and Caperton as prime examples of controlling authority, these cases require a closer look than they have received.
I. STATE V. GUDGEON
¶ 73. State v. Gudgeon was decided by the court of appeals in 2006. The defendant was charged on July 24, 2000, with three offenses: (1) operating a motor vehicle without owner's consent, (2) fleeing or eluding an officer, and (3) resisting or obstructing an officer. These charges "arose from an incident in which Gudgeon took off with another individual's motorcycle and attempted to flee from police." Gudgeon, 295 Wis. 2d 189, ¶ 2. "After Gudgeon abandoned the motorcycle in a ditch, one of the officers in pursuit accidentally ran into it. The bike was destroyed." Id.
¶ 74. When Gudgeon entered a plea to the first of the three offenses on August 24, 2000, as part of a plea bargain, he was given two years of probation, with six months of jail time subject to work release privileges. The six months were then stayed. This withheld sentence was designed to assist Gudgeon in paying $8,425 in restitution for the destroyed motorcycle.[1] Id.
¶ 75. Unfortunately, Gudgeon did not take advantage of the court's leniency. He violated the rules of probation, then stipulated to serving six months of jail time.
¶ 76. On May 15, 2002, Gudgeon's probation agent notified the court that Gudgeon's probation was about to expire. She advised that Gudgeon was unable to use his work release privileges because of pending *367 charges in Kenosha County and McHenry County, Illinois. She recommended that Gudgeon's unpaid restitution be converted to a civil judgment. Id., ¶ 3. She gave reasons for this recommendation, namely, that a civil judgment would earn interest for the victim, while extending Gudgeon's supervision would not; and Gudgeon's supervision might be difficult if Gudgeon were convicted in Illinois. Id.
¶ 77. In reply, Judge Michael Gibbs — who replaced the judge who had sentenced Gudgeon because of judicial rotation — handwrote at the bottom of the letter, "No — I want his probation extended," and he sent copies of the agent's letter "to the probation agent, the district attorney, and Gudgeon's last attorney of record." Id.
¶ 78. On May 30, 2002, Gudgeon's probation agent sent another letter to the court, acknowledging that the court wanted Gudgeon's probation extended but asserting that Gudgeon would not agree to a probation extension without first discussing the matter with a lawyer. Gudgeon's refusal to permit his extension by waiver meant that an extension hearing was required.
¶ 79. Gudgeon's refusal to waive the probation extension was noted at the August 21 extension hearing. An assistant district attorney pointed out that Gudgeon had outstanding restitution and Gudgeon admitted that he had paid only a small portion out of the required $8,425, so that he still owed $7,834.53. He also had other court costs to pay. Gudgeon explained that he had not paid more because he had spent a lot of time in custody and had not been able to work. Judge Gibbs extended Gudgeon's probation at the hearing, explaining, "The only way I can see where we can make sure you are going to pay is to keep the hammer over *368 your head, give you an incentive to pay it. . . . Your probation is going to be extended for two years. If you pay that off, you get off supervision. The sooner you pay it off, the sooner you get off probation." Gudgeon did not appeal the extension.
¶ 80. The following year Gudgeon's probation was revoked because of new violations, and he was sentenced to prison. He did not appeal this sentence either.
¶ 81. Gudgeon's next step was to file a postconviction motion under Wis. Stat. § 974.06. "He alleged [in the motion] that his due process rights had been violated during the extension proceedings because the presiding judge was not a neutral magistrate. Gudgeon read the court's handwritten notation on the letter from his probation agent as prejudging the case with respect to whether to extend probation." Id,., ¶ 5.
¶ 82. The court of appeals bought Gudgeon's argument. It assumed a sufficient reason for a collateral attack under Wis. Stat. § 974.06 because of newly discovered evidence, even though the court had sent a copy of the letter with notation to Gudgeon's last attorney and Gudgeon had obviously discussed the judge's thinking with his probation agent. The court of appeals then suggested that the circuit court had deprived Gudgeon of an impartial and unbiased tribunal and deemed this denial equivalent to deprivation of counsel — a "structural error" not subject to harmless error analysis.
¶ 83. In sum, although the court of appeals was unwilling to conclude that Judge Gibbs was actually biased ("We cannot conclude that the court's notation on the letter persuasively establishes actual bias in and of itself given our experience and the reputation of this particular trial judge as a fair and just adminis *369 trator of the law"), it nonetheless detected the "appearance of partiality." Gudgeon, 295 Wis. 2d 189, ¶ 25. The court said:
[T]he appearance of bias offends constitutional due process principles whenever a reasonable person— taking into consideration human psychological tendencies and weaknesses — concludes that the average judge could not be trusted to "hold the balance nice, clear and true" under all the circumstances.
Id., f 24.
¶ 84. The court of appeals quoted various opinions to define the role of appellate judges. Appellate judges "determine whether 'the potential for bias is sufficiently great' to sway the average person serving as judge away from neutrality" and "due process is violated . . . [when] the risk of bias is impermissibly high." Id. The court added:
We must resolve this case based on what a reasonable person would conclude from reading the court's notation, not what a reasonable trial judge, a reasonable appellate judge, or even a reasonable legal practitioner would conclude.
Id., ¶ 26.
¶ 85. In my view, the Gudgeon case does not provide clear guidance to Wisconsin judges. Appellate judges are supposed to determine, not as fact but as a matter of law, whether a reasonable person — taking into consideration human psychological tendencies and weaknesses — would "conclude" ("conclude" implies a legal determination) that the average judge (not the judge who is the subject of inquiry) could be trusted to make a fair decision, given certain facts. These appellate judges apparently may not consider such legal realities as the fact that judges in Walworth County *370 frequently extended probation when a probationer failed to pay off or make good progress in paying off restitution, and the law that criminal court judges lose control of restitution when probation ends and a probationer's unpaid restitution is converted to a civil judgment. See Huml v. Vlazny, 2006 WI 87, 293 Wis. 2d 169, 716 N.W.2d 807. Reasonable trial judges, reasonable appellate judges, and reasonable legal practitioners would know that circuit judges, "for cause or by order," may extend probation for a stated period, Wis. Stat. § 973.09(3)(a), especially when "The probationer has not made a good faith effort to discharge court-ordered obligations or pay fees owed under s. 304.074." Wis. Stat. § 973.09(3)(c)1.
¶ 86. Apparently, a "reasonable person" who is not a judge or legal practitioner may not consider this information. It is not at all clear what "the reasonable person" is supposed to consider beyond his or her psychological hunches.
¶ 87. The Gudgeon court said, "Although we may be convinced that the circuit court was not prejudging the extension issue, that is not the test. The risk of bias that the ordinary reasonable person would discern . . . is the test." Id., ¶ 30. That "risk" "is simply too great to comport with constitutional due process." Id.
¶ 88. The court of appeals remanded the case to the circuit court for a new probation extension hearing, saying "when a tribunal predetermines how it will rule, the error is structural and poisons the entire proceeding." Id., ¶ 31. This court denied the State's petition for review. When the Gudgeon case was remanded, however, Gudgeon himself waived rights to a new hearing — likely knowing that he could not establish "newly discovered evidence" or escape from another extension of his probation.
*371 II. STATE V. GOODSON
¶ 89. State v. Goodson was decided in 2009, three years after Gudgeon. The court forthrightly acknowledged that "Our decision in Gudgeon guides our conclusion." Goodson, 320 Wis. 2d 166, ¶ 10.
¶ 90. In Goodson, the defendant was convicted of five criminal offenses, including two felony counts of possession of a short-barreled firearm and fourth-degree sexual assault (reduced from second-degree sexual assault).[2] He was given a 45-month prison sentence by Outagamie County Circuit Judge Harold Froehlich. Goodson's sentence was reversed by the court of appeals on grounds that his counsel provided ineffective assistance at the sentencing hearing.
¶ 91. The case was remanded and assigned to Circuit Judge Mark McGinnis. At a new sentencing hearing on October 11, 2005, Judge McGinnis described Goodson's abuse of his ex-wife and daughter, noting that he had "physically, psychologically, emotionally, sexually, you raped her, verbally abused and just abused her for many years. Do I think you are dangerous? Absolutely."
¶ 92. Judge McGinnis added, "I am tempted to just give you the maximum today. I don't have to go along with joint recommendations .... I sit here and read this file over, and I say why. What did your ex-wife ever do to deserve that? And the answer is: She didn't do anything to deserve it, period."
¶ 93. Judge McGinnis then imposed sentence:
*372 On one of the firearm counts, the court sentenced Goodson to six years' imprisonment, with three years' initial confinement and three years' extended supervision. On the other firearm count and the sexual assault, it withheld sentence and placed Goodson on probation consecutive to the prison sentence. On the remaining two misdemeanors, it sentenced Goodson to ninety-day jail terms, concurrent with each other but consecutive to the prison sentence. The court announced it was structuring the sentence like this to "Chang the] maximum penalty over [Goodson] . . . ." The court warned Goodson "[I]f you deviate one inch from these rules, and you may think I'm kidding, but I'm not, you will come back here, and you will be given the maximum, period. Do you understand that?" Goodson replied that he did.
Id., ¶ 2 (footnote omitted).
¶ 94. Like Judge Froehlich's sentence, Judge McGinnis's sentence resulted in 45 months of confinement, but Goodson was given 857 days of credit on the sentence because of his time in custody. This resulted in 338 days of remaining confinement — less than a year.
¶ 95. When Goodson completed his confinement time, he was inadvertently reincarcerated at the Outagamie County Jail, where he was soon charged with battery by a prisoner. Due to its mistake of taking Goodson into custody, the Department of Corrections recommended limiting reconfinement to the 113 days of time served in jail. Judge McGinnis accepted this recommendation, giving Goodson the benefit of the doubt. Id., ¶¶ 3-4. In other words, Judge McGinnis did not give Goodson "the maximum."
¶ 96. Five months later, however, after Goodson's extended supervision was revoked for numerous violations, Judge McGinnis reconfined Goodson for the *373 maximum period of time available — two years, eight months, and 17 days. Goodson had been arrested after he threatened a new girlfriend, and attempted to commit suicide by driving the girlfriend's truck head-on into a concrete pole, causing himself serious injury.
¶ 97. The circuit court's sentence seemed to shock the court of appeals: "By prejudging Goodson's reconfinement sentence, the court was objectively biased. Therefore, Goodson is entitled to a new reconfinement sentence hearing." Id., ¶ 1.
¶ 98. The court stated that Goodson's appeal "requires us to determine whether Goodson was sentenced by an impartial judge. Whether a circuit court's partiality can be questioned is a matter of law that we review independently." Id., ¶ 7.
¶ 99. The court of appeals then concluded that the circuit court was objectively biased — that is, the court gave "the appearance of bias" and the court was actually biased as well, although "Goodson concedes he cannot show the court was subjectively biased." Id., ¶ 8. As to the appearance of bias, the court quoted the Gudgeon passage about the reasonable person concluding that "the average judge could not be trusted." Id., ¶ 9 (quoting Gudgeon, 295 Wis. 2d 189, ¶ 24). The court added: "[T]he appearance of partiality constitutes objective bias when a reasonable person could question the court's impartiality based on the court's statements." Id., ¶ 9 (citing Gudgeon, 295 Wis. 2d 189, ¶ 26).
¶ 100. The court continued:
We agree with Goodson that a reasonable person would interpret the court's statements to mean it made up its mind before the reconfinement hearing—
*374 Here, the court unequivocally promised to sentence Goodson to the maximum period of time if he violated his supervision rules. A reasonable person would conclude that a judge would intend to keep such a promise — that the judge had made up his mind about Goodson's sentence before the reconfinement hearing. This appearance constitutes objective bias.
Id., ¶¶ 10, 13
¶ 101. The court went on to conclude that "There could not be a more explicit statement confirming that the sentence was predecided. This is definitive evidence of actual bias." Id., ¶ 16.
¶ 102. Clearly, this writer is uncomfortable with the decisions in Gudgeon and Goodson. Both courts failed to disclose all the facts. Both courts did not contend that the defendants had actually suffered unfair treatment. Both courts left open the question whether there would have been any "bias" at all if the judges had kept their thinking to themselves. The Goodson court, following Gudgeon, did not explain why the imposition of a heavy penalty in a sentence that is stayed, see, Wis. Stat. § 973.09(1)(a), would not be "prejudging" the defendant's sentence if his or her probation were revoked. The court's ruling is certainly inconsistent with the practice in drug courts.
¶ 103. More important, the two cases applied their ambiguous tests for bias in situations — probation extension and reconfinement sentencing — in which the stakes were not very high. One wonders whether the court of appeals would have developed and applied the same tests if confronted with a situation where the stakes were critical, such as wiping out a homicide conviction after a four-week jury trial, even though a judge's candid statement may never have been heard *375 by a jury trying the facts. After all, in the Gudgeon court's view, bias — and even more, the appearance of bias — may be wholly unrelated to any actual unfairness to the defendant.
III. CAPERTON V.A.T. MASSEY COAL CO.
¶ 104. The Caperton case is a different animal. The facts in Caperton created the widespread impression that a single individual spent more than $3 million to elect a new supreme court justice who would overturn a $50 million jury verdict in a specific case involving the individual that was soon to come before the West Virginia Supreme Court. The United States Supreme Court's decision is completely understandable. The problem in Caperton, like the problem in Gudgeon and Goodson, is that its broad language is difficult to cabin and thus invites application in materially different fact situations.
¶ 105. The Caperton majority said that an appellate court's objective inquiry is "whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias,'" Caperton, 556 U.S. at 881; whether an interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden," id. at 884, whether there is "a serious risk of actual bias." Id. The Court added: "[Objective standards may... require recusal whether or not actual bias exists or can be proved." Id. at 886.
¶ 106. The Caperton Court noted that "Massey and its amici predict that various adverse consequences will follow from recognizing a constitutional violation here — ranging from a flood of recusal motions" to interference with judicial elections. Id. at 887. *376 "We disagree." Id. The Supreme Court may have been correct in Caperton but it was not correct with respect to this latter comment, at least in Wisconsin.
¶ 107. The reality of contemporary life is that the appearance of bias can be created for a judge by someone other than the judge. What are judges to do in this situation? How are they supposed to assess the reasonable person's conclusions if the reasonable person is basing his conclusions on misleading information?
¶ 108. My concern with the lead opinion is its veneration of the "appearance of bias" standard without providing any additional guidance as to when or how to apply this imprecise standard. The lead opinion's discussion of the "appearance of bias" sharply contrasts with its detailed analysis of the facts that properly determine the outcome of this case.
¶ 109. Chief Justice Roberts stated in his dissent in Caperton:
The Court's new "rule" provides no guidance to judges and litigants about when recusal will be constitutionally required. This will inevitably lead to an increase in allegations that judges are biased, however groundless those charges may be. The end result will do far more to erode public confidence injudicial impartiality than an isolated failure to recuse in a particular case.
Id. at 890-91 (Roberts, C.J., dissenting). I share Chief Justice Roberts' concerns about the state of the law as it relates to bias and constitutionally required recusal. Without clarification and guidance, these developments in the law may "do far more to erode public confidence injudicial impartiality" than the occasional misstep by a judge.
*377 ¶ 110. For the foregoing reasons, I respectfully concur.
¶ 111. I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this opinion.

 Some of the facts outlined in this concurrence are taken from Gudgeon's 2005 brief to the court of appeals.

 Some of the facts in this discussion are taken from Goodson's brief in the court of appeals as well as a prior unpublished court of appeals decision, State v. Goodson, No. 2004AP2913-CR, unpublished slip op. (Jul. 6, 2005).