COURT OF APPEALS
DECISION
DATED AND FILED

March 25, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.** **2022AP647-CR**

Cir. Ct. No. 2019CF100

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT III**

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

ANTHONY J. LAROSE,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Oneida County: PATRICK F. O'MELIA, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Gill, JJ.

¶1 HRUZ, J. Anthony LaRose appeals an order denying his postconviction motion for resentencing on his conviction for first-degree sexual assault of a child. In that motion, LaRose claimed that the circuit court judge was biased against him based on three sets of facts. First, he pointed to various

comments that the same judge had made to LaRose during a sentencing hearing that took place approximately ten years earlier. Second, LaRose complained that the judge conducted an independent investigation into LaRose's juvenile and adult criminal history, and the judge failed to advise the parties ahead of the sentencing hearing that he did so. Third, LaRose argued that the judge improperly made comments about a divorce proceeding that the judge had recently presided over, with which LaRose had a connection, and LaRose's "undesirable behavior patterns," especially pertaining to his sexual proclivities.

¶2 We conclude that LaRose has failed to meet his burden to rebut the presumption that the circuit court judge acted fairly, impartially, and without bias. *See Miller v. Carroll*, 2020 WI 56, ¶16, 392 Wis. 2d 49, 944 N.W.2d 542. First, the judge's comments from the earlier sentencing hearing were warnings to LaRose, rather than a predetermined sentence, and were far too attenuated—both in substance and in time—from the sentencing in this case. Second, the judge's comments regarding LaRose's juvenile and adult criminal history based on the judge's independent investigation were already known to the parties and to the judge because those facts were noted in LaRose's presentence investigation report (PSI). Finally, the judge's comments regarding both the divorce proceeding he presided over and LaRose's sexual behavior were based on an appropriate sentencing factor that the judge considered, negative facts about LaRose presented in the PSI, and the overall nature of the offense LaRose committed.

¶3 In sum, and as explained more fully below, LaRose has failed to establish that the circuit court judge's comments and actions of which he complains, either individually or taken together, show a serious risk of actual bias that rises to the level of a due process violation. *See id.*, ¶24. Accordingly, we affirm.

## BACKGROUND

¶4     In 2019, the State charged LaRose with first-degree sexual assault of a child (sexual intercourse with a person under age twelve), involving a nine-year-old victim.  Pursuant to a plea agreement, LaRose agreed to plead guilty to an amended charge of first-degree sexual assault of a child (sexual contact with a person under age thirteen) and a charge of contempt of court in a separate case.  The State agreed to dismiss and read in charges in two other cases.  As to a sentencing recommendation for the sexual assault charge, the parties agreed to jointly recommend a prison sentence of thirty-four to thirty-seven years, consisting of fourteen to seventeen years of initial confinement followed by twenty years of extended supervision.  The circuit court accepted LaRose's guilty pleas and found him guilty of both charges.  The court then ordered a PSI.

¶5     The PSI provided information regarding LaRose's criminal record and correctional experience, his employment history, and his sexual behavior generally, as well as statements from his family.  The PSI also provided the victim's and LaRose's respective accounts of the sexual assault for which he was convicted.  The victim described the sexual intercourse with LaRose and stated that inappropriate touching had occurred "almost once a week."  The victim also stated that LaRose would "make her smoke something … almost every time the assaults occurred."  LaRose denied having sexual intercourse with the victim, but he admitted to inappropriately touching the victim more than once.  He also denied making the victim smoke marijuana before the assaults, but he admitted that he frequently smoked marijuana around the children in the home.

¶6     In discussing LaRose's criminal record, the PSI listed the charges and dispositions of LaRose's past cases.  Although the PSI author was unable to access

LaRose's juvenile record, LaRose had stated to the author that his juvenile record was similar to his adult criminal record, and LaRose's mother also provided information about LaRose's juvenile record. In particular, LaRose's mother stated that his first contact with the legal system began when LaRose was around eight years old, when he was charged with battery for kicking a teacher who had physically restrained him. LaRose's mother also stated that LaRose had "behavioral issues" while growing up and described her attempts to deal with them.

¶7 In outlining LaRose's correctional experience, the PSI recounted LaRose's probation experience and the actions that led to the dismissed and read-in charges in this case. The PSI also described LaRose's employment history. LaRose stated that he had several jobs "for short periods of time," that he was a stay-at-home dad, and that his wife "was the 'sole breadwinner in the family.'" Regarding LaRose's family, the PSI noted that LaRose and his wife were separated for a time "as a result of LaRose's infidelity in which he impregnated [his wife's] best friend." LaRose confirmed this story to the PSI author, but he explained that his wife's friend and her husband raised the child as their own. LaRose's wife told the PSI author that LaRose had been "unfaithful throughout their marriage." She also described a domestic violence incident LaRose committed against her.

¶8 In the PSI's section on LaRose's sexual behavior, LaRose told the author that he "often sought extramarital sex" and that he believed he "has a sex addiction." He also described himself "as a very sexual person." Notably, LaRose acknowledged that the sexual assaults with the child victim would have continued if she had not reported them.

¶9 The PSI ultimately recommended a prison sentence of thirty to thirty-five years of initial confinement and seven to ten years of extended supervision for the sexual assault charge.

¶10 At the sentencing hearing in 2019, LaRose's counsel noted that LaRose's first arrest occurred when he was eight years old, that his youth was characterized by impulse control and anger issues, and that LaRose struggled to maintain employment because of his mental health and behavioral issues. Both LaRose's counsel and the State asked the court to follow the joint recommendation made in the plea agreement.

¶11 Following LaRose's allocution, the circuit court judge began his sentencing comments by explaining to LaRose the sentencing factors he had to consider, stating that "frankly with your prior history you've heard this before." The judge explained that probation was the "preferred sentence" unless a defendant's treatment needs would be better met while in custody or the imposition of probation would unduly depreciate the seriousness of the offense. The judge then listed the factors he could consider when imposing a sentence, which included the following: (1) the number of victims; (2) any injuries sustained by the victims and the severity of those injuries; (3) the effect on the victims; (4) the defendant's age, education and employment; (5) the defendant's criminal record; and (6) the defendant's "undesirable behavior patterns," family history, substance abuse issues, demeanor, and remorse.

¶12 The circuit court judge stated that he had ordered a PSI because he "didn't know [LaRose] before all this occurred, except I think [I] probably prosecuted you back in the early 2000s," and "to get a little better idea where you've been for the last 15, 16 years." The judge began with LaRose's criminal record,

noting, "I know the counsel probably can't, but I'm able to go back to the juvenile records, to the incident where you did hit a teacher or pushed the teacher. Police were called." Upon the judge expressing uncertainty about whether that offense occurred in Oneida County, LaRose informed him that it had occurred in Rock County. Continuing, the judge noted that LaRose's criminal record "started very young, younger than I've actually ever seen where you're actually involved in the juvenile justice system at that young age."

¶13 The circuit court judge moved on to LaRose's adult criminal record, stating that he "read the complaints going back, it's a lot of the same behavior, just a different age." The judge recounted LaRose's probation experience in past cases, the cases that were dismissed and read in as part of the plea agreement, and the domestic violence incident noted by LaRose's wife as recounted in the PSI. Observing the PSI's description of LaRose's employment history, the judge commented to LaRose: "You're not able to really keep a stable lifestyle for the family and then to the point where you ultimately began taking care of the children in lieu of working and allowing your wife to work and be the breadwinner."

¶14 Next, the circuit court judge explained what he meant by a defendant's "undesirable behavior patterns":

> That means a lot of people get arrested, get charged, go on probation. That's criminal convictions. But there are things that people do that are—they don't get caught for or it may not … even [be] against the law, but it's an undesirable behavior pattern, such as it's not against the law to sit at home all day and eat potato chips and play video games, but that's an undesirable behavior pattern. And in this case we've kind [of] got that, but it's kind of aggravated with smoking dope and having kids in the house.

6

The judge described LaRose's marijuana use as an undesirable behavior pattern, noting that it was "not proper [for LaRose] to smoke in the house" while his children were observing him.

¶15     As another undesirable pattern of behavior, the circuit court judge stated that LaRose, by his own admission, had "some very strong sexual addictions to the point where you've been unfaithful to your wife on more than one occasion, fathered a child with another married woman who, by the way, just this morning I had her in court." Elaborating, the judge noted that he had presided over that woman's divorce earlier in the day and that he asked her about her son because he "wanted to make sure that the dad in that case knew that somebody else had fathered the child. Well, anyway, he did." The judge added, "I'm not saying it's a direct result of what happened here, but I'm sure it didn't help their marital relationship…. Having that, always waking up to that every day, being reminded that my wife was unfaithful or my husband was unfaithful."

¶16     Based on information in the PSI, the circuit court judge also considered what he called LaRose's narcissistic tendencies and manipulative conduct as additional undesirable behavior patterns. The judge noted that LaRose "is very self-protecting" and "self-explain[s] things away" to "try and put [himself] in a better light with people." The judge also discussed the effects of LaRose's manipulation on the victim, and he noted LaRose's admission that the assaults "would still be going on. This was not going to stop."

¶17     The circuit court judge next discussed the prospect that other people had been victimized by LaRose's conduct, stating: "[A]s I sat this morning doing the divorce I'm like, geez, are they a victim of what happened or what you do, you know? Because of your undesirable behavior patterns is that [other woman] a

7

victim?" The judge then moved on to discuss the victim's mother, the victim's grandparents, and LaRose's children as other victims.

¶18 In relating his final thoughts, the circuit court judge stated:

> I wrote down here I have a 34-year-old narcissist with basically a ninth grade education with an HSED, limited, sporadic employment, long criminal history, smokes dope almost every day while he's in charge of the children exposing them to THC … to the point of positive results. Hobbies are tinkering with motors, listening to music, playing video games, finally an insatiable appetite for sex of any kind, with anyone, even the [victim].

The circuit court ultimately imposed a forty-five-year prison sentence, consisting of twenty-five years of initial confinement followed by twenty years of extended supervision.

¶19 LaRose filed a postconviction motion seeking resentencing before a different judge on the ground that the circuit court judge had exhibited objective bias. The judge did so, according to LaRose, by: (1) conducting an independent factual investigation; (2) relying on the facts he had independently discovered without providing the parties an opportunity to verify or respond to those facts; (3) expressing opinions in his sentencing comments "that revealed a high degree of antagonism" toward LaRose; and (4) predetermining the need to send LaRose to prison based on comments the judge had made during a sentencing hearing that occurred in 2009.[1]

¶20 In support of his motion, LaRose provided a portion of the transcript from the 2009 hearing in which the circuit court sentenced him after revocation of

---

[1] Alternatively, LaRose argued that the circuit court had erroneously exercised its sentencing discretion by relying on LaRose's gender when imposing sentence. LaRose does not raise this argument on appeal. Therefore, we do not address it further.

his probation. During that sentencing, the circuit court judge noted LaRose's then already lengthy criminal record and stated:

> You've been in court so much you know what to say to the judges, and you've seen lots of different judges before. But … it's to a point where we almost don't care what you do. We'll just keep putting you in jail and put you ultimately in prison because that's where you're headed. They should have cited you with [a] repeater.
>
> I don't know, do you have a felony conviction at all?

In response to LaRose denying that he had a felony conviction, the judge said, "All right. Because if this continues and there's a felony, boy, it's—I'm not sure how another court could really keep you from prison. And you're not too far from a felony." In explaining what would have made LaRose's offense a felony, the judge stated, "The gal you threw against the wall at the bowling alley, cut on her head …. All that's required is if she had to have one stitch to close the wound, that will be a felony."

¶21 The circuit court held a nonevidentiary hearing on LaRose's postconviction motion. The circuit court judge acknowledged that he referenced the divorce proceeding in his sentencing comments, but he explained that his comments were musings about whether the divorce was a collateral result in the overall context of determining if there were other victims from LaRose's sexual behavior that contributed to the charged sexual assault of a child. The judge stated he was not suggesting the divorce was directly related to the charged offense, but rather the comments were him simply "thinking out loud but wondering the effects of [LaRose's] actions that perhaps are unforeseen at this point." The judge added that LaRose's sexual behavior was mentioned throughout the PSI, so his reference to the divorce was "inconsequential."

¶22    The circuit court judge also acknowledged his sentencing comment that the PSI author did not have access to LaRose's juvenile record, but the judge noted that he merely referenced the information LaRose's mother had provided in the PSI "that [LaRose] was an eight-year-old child, battery by kicking the teacher." As for LaRose's adult criminal record, the judge again noted that the PSI laid out the types of crimes and discussed some of those incidents "that were consistent with his 15 years prior." Regarding his antagonistic comments toward LaRose, the judge explained that they were due to "the nature of this case" and that the judge "has to speak freely and frankly" when speaking to a defendant at sentencing. As to his comments describing LaRose as narcissistic and manipulative, the judge explained that they were based on LaRose's mother's comments in the PSI and that LaRose had manipulated a child "to do the things that he did."

¶23    Finally, with respect to his comments from the 2009 sentencing hearing, the circuit court judge noted his sentencing comment in this case stating that he did not know LaRose. The judge also pointed out that he did not reference the 2009 hearing at all. Indeed, he noted that it was not until he received LaRose's postconviction motion that he became aware of having presided over the 2009 hearing. The judge explained that his comments in the 2009 hearing were not a threat to LaRose, but that he made those comments to deter LaRose. He further explained that he made those comments in 2009 because LaRose "had been going down the wrong path," and he wanted to convey to LaRose "that a court, whether it's me or some other court, is going to pretty soon … have to start considering more punishment. That's not a promise."

¶24    For all of these reasons, the circuit court concluded that LaRose had not shown that the judge exhibited objective bias, and it denied LaRose's postconviction motion. LaRose now appeals.

10

# DISCUSSION

¶25  On appeal, LaRose argues that the circuit court judge's predetermination that LaRose needed to have prison time in this case at the 2009 hearing, the judge's independent investigation, and the judge's "expressions of antipathy" toward LaRose at his sentencing, individually and taken together, show that the judge was objectively biased.  Given that LaRose does not argue that the judge was subjectively biased or that his comments show actual bias,[2] we address only whether LaRose has rebutted the presumption that the judge acted fairly, impartially, and without bias by showing that his comments gave rise to a serious risk of actual bias.[3]

¶26  "The right to an impartial judge is fundamental to our notion of due process."  *State v. Goodson*, 2009 WI App 107, ¶8, 320 Wis. 2d 166, 771 N.W.2d 385.  When evaluating a judicial bias claim, we presume that the judge has acted fairly, impartially, and without bias.  *Id.*  To overcome this presumption, the party asserting judicial bias must show either subjective or objective bias by a preponderance of the evidence.  *Miller*, 392 Wis. 2d 49, ¶21.  If a party rebuts the presumption "and shows a due process violation, the error is structural and not

---

[2] Subjective bias exists when a judge has "any personal doubts as to whether [he or she] can avoid partiality to one side."  *State v. Gudgeon*, 2006 WI App 143, ¶20, 295 Wis. 2d 189, 720 N.W.2d 114.  Actual bias occurs when there are objective facts showing that the judge "in fact treated [the defendant] unfairly."  *State v. Goodson*, 2009 WI App 107, ¶9, 320 Wis. 2d 166, 771 N.W.2d 385 (alteration in original; citation omitted).

[3] The parties argue over whether it is proper for LaRose to use the "appearance of bias" language that Wisconsin courts applied in judicial bias decisions prior to *Miller v. Carroll*, 2020 WI 56, 392 Wis. 2d 49, 944 N.W.2d 542.  Despite this dispute, they ultimately—and correctly—agree that LaRose must show a serious risk of actual bias to overcome the presumption that the circuit court judge acted fairly, impartially, and without bias.

subject to a harmless error analysis." ***Id.***, ¶16. Whether a judge's partiality can reasonably be questioned is a matter of law that we review de novo. ***Id.***, ¶15.

¶27 In an objective bias analysis, the party asserting bias rebuts the presumption of impartiality by showing actual bias or a serious risk of actual bias. *See **Goodson***, 320 Wis. 2d 166, ¶¶8, 14. We determine whether there is a serious risk of actual bias "based on objective and reasonable perceptions." ***Miller***, 392 Wis. 2d 49, ¶24 (quoting ***Caperton v. A.T. Massey Coal Co.***, 556 U.S. 868, 884 (2009)). This analysis requires an inquiry into "whether 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented,'" and "whether the circumstances 'would offer a possible temptation to the average … judge to … lead him [or her] not to hold the balance nice, clear and true.'" ***Id.***, ¶¶22, 24 (quoting ***Caperton***, 556 U.S. at 883-85). "[I]t is the exceptional case with 'extreme facts' which rises to the level of a 'serious risk of actual bias.'" ***Id.***, ¶24 (citation omitted).

## I. The Circuit Court Judge's 2009 Comments

¶28 LaRose first argues that the circuit court judge's comments at the 2009 sentencing hearing show that the judge had "predetermined the necessity of prison should … LaRose eventually face sentencing for a felony." Specifically, LaRose contends that the following comments show a serious risk of actual bias because they reveal the judge's intended disposition, if he were ever to sentence LaRose for a felony, to impose a prison sentence: (a) that "courts" will "just keep putting you in jail and put you ultimately in prison because that's where you're headed"; (b) that LaRose should have been charged as a repeater in that earlier case; and (c) that if LaRose were charged with a felony, the judge was unsure "how another court could

really keep you from prison." LaRose asserts that the judge's 2009 comments rise to the same level of bias as in several cases, discussed in detail below, where we have concluded that a judge's comments showed he or she had predetermined a defendant's sentence and therefore gave rise to a serious risk of actual bias.

¶29     We reject LaRose's reliance on those cases, given the totality of the circumstances here. Unlike the language in the cases he cites, the circuit court judge's 2009 comments contain no promissory language that even suggests the judge had predetermined LaRose's sentence in this case. Juxtaposing those cases with this one, we conclude that the judge's comments here were simply admonitions to LaRose that did not show a serious risk of actual bias.

¶30     We begin our analysis of the cases on which LaRose relies with ***State v. Gudgeon***, 2006 WI App 143, ¶¶3-4, 295 Wis. 2d 189, 720 N.W.2d 114, where the defendant's probation agent wrote a letter to the circuit court prior to a probation extension hearing, proposing that the court convert the defendant's restitution into a civil judgment rather than extending the defendant's probation. The circuit court judge responded by writing at the bottom of the letter, "No—I want [the defendant's] probation extended." ***Id.***, ¶3. At the extension hearing, the court extended the defendant's probation. ***Id.***, ¶4. On appeal, we concluded that the judge's use of the word "want" showed a serious risk of actual bias because an "ordinary reasonable person would discern a great risk" that the judge "had already made up [his] mind to extend probation long before the extension hearing took place." ***Id.***, ¶26. We explained that the judge's use of the word "want" signified his personal desire, which referred "not to an extension *hearing*—at which to decide the merits of extension versus a civil judgment—but to the extension itself, an ultimate outcome." ***Id.***

¶31 A predetermined outcome was also present in *Goodson*, where the circuit court judge warned the defendant throughout the sentencing hearing that if "you deviate one inch from these [probation or extended supervision] rules, and you may think I'm kidding, but I'm not, you will come back here, and you will be given the maximum." *Goodson*, 320 Wis. 2d 166, ¶2. The judge followed through with this promise after the defendant's extended supervision was revoked. *Id.*, ¶5. The judge stated that his decision was "pretty easy" and that the maximum period of reconfinement was appropriate "not because that's the sentence I'm giving you today, [but] because that's the agreement you and I had back at the time that you were sentenced." *Id.* (alteration in original). On appeal, we concluded that the judge's statements showed a serious risk of actual bias. *See id.*, ¶13. The judge's unequivocal promise to impose the maximum period of confinement time would lead a reasonable person to conclude "that a judge would intend to keep such a promise—that the judge had made up his mind about [the defendant]'s sentence before the reconfinement hearing."[4] *Id.*

¶32 We reached the same conclusion in *State v. Lamb*, No. 2017AP1430-CR, unpublished slip op. ¶¶5-6, 16 (WI App Sept. 25, 2018),[5] where, prior to the circuit court hearing sentencing arguments, the defendant talked about being on probation and "the possibility of leaving today," and the circuit court judge interrupted by stating, "Not really. Okay. Just thought I'd tell you that so

---

[4] We also concluded that the circuit court judge's statements that his decision was "pretty easy" and that the maximum period of confinement was appropriate because it was what the judge and the defendant had "agreed to" at the sentencing hearing were "definitive evidence of actual bias" because "[t]here could not be a more explicit statement confirming that the sentence was predecided." *Goodson*, 320 Wis. 2d 166, ¶16.

[5] An unpublished opinion that is authored by a member of a three-judge panel and issued on or after July 1, 2009, may be cited for its persuasive value. *See* WIS. STAT. RULE 809.23(3)(b) (2023-24).

you don't have any false hopes. I mean, there's a possibility, but it's probably not going to happen." The judge then asked whether the defendant wanted to proceed with sentencing "now that you know that it probably isn't going to happen that you're going to get out today." *Id.*, ¶5. After hearing the parties' arguments recommending probation and the defendant's allocution, the judge began his sentencing remarks by stating, "Well, just so there's no surprise, I mean, you are going to prison today." *Id.*, ¶6.

¶33 On appeal, we concluded that the circuit court judge's comments showed a serious risk of actual bias because "a reasonable lay observer would interpret them as prejudging [the defendant]'s sentence." *Id.*, ¶14. Of particular importance was the timing of the judge's statements, which were made immediately prior to hearing the parties' sentencing arguments and the defendant's allocution. *Id.*, ¶15. Furthermore, the parties had agreed to forgo a PSI, "which would have contained essential sentencing information about the offense and [the defendant]'s character." *Id.* Although the judge spoke of probabilities and possibilities, his statements, taken together, reasonably conveyed to the defendant that the judge "had effectively decided against ordering probation" before hearing any sentencing arguments. *Id.*, ¶17.

¶34 Finally, in *State v. Marcotte*, 2020 WI App 28, ¶3, 392 Wis. 2d 183, 943 N.W.2d 911, the parties jointly recommended that the circuit court withhold sentence and order probation, which included a condition that the defendant participate in that county's drug treatment court program. At both a drug court hearing that took place prior to the defendant's sentencing and at his sentencing, the same circuit court judge told the defendant that he would go to prison if he failed in drug court and that there would be "no mercy" when the defendant returned to court for sentencing after revocation of probation. *Id.*, ¶¶4-5. The defendant was

15

subsequently terminated from drug court and his probation was revoked. *Id.*, ¶8. The court imposed a prison sentence, stating that it had "no choice" but to impose a prison sentence because the defendant failed in drug court. *Id.*, ¶¶10, 13. On appeal, we concluded that the judge's comments and the judge's dual role in presiding over the sentencing court and the drug court, taken together, gave rise to a serious risk of actual bias. *Id.*, ¶18.

¶35 Prominent in the foregoing cases is promissory language that would lead a reasonable observer to conclude that the judge had predetermined the defendant's forthcoming sentence prior to the sentencing hearing and that the judge's sentence was a guarantee, rather than a possibility. The same cannot be said of the circuit court judge's 2009 comments that "courts" would ultimately put LaRose in prison because that is where he was headed and that the judge was not sure how another court could keep him from prison. When read in context, the judge's 2009 comments can best be characterized as a warning that prison was likely forthcoming if LaRose were convicted of a felony and appeared for sentencing before any court, rather than a promise that the judge himself would put LaRose in prison if he were convicted of a felony and appeared again before that same judge. Explaining to a defendant what could happen if a particular event were to occur is permissible; it is a judge telling that defendant what *will* happen that "imperils the defendant's due process right to an impartial judge." *See Goodson*, 320 Wis. 2d 166, ¶17; *see also Marcotte*, 392 Wis. 2d 183, ¶24 (explaining that the judge went beyond "merely informing [the defendant] of what *could* happen if he failed drug court and instead informed him of what *would* happen if he failed").

¶36 The circuit court judge's 2009 comments were admonitions that sound nothing like the unequivocal promises by the judges in *Goodson* and *Marcotte*. They were a warning of what LaRose could face if he continued with his

increasingly serious criminal behavior, and they spoke only of possibilities in the form of what could happen should LaRose not discontinue his criminal behavior because he was "not too far from a felony." In no way do these comments convey a guarantee by the judge that he would impose a prison sentence like the judge's comments did in *Lamb*. Similarly, the judge's single comment that LaRose "should have been charged" as a repeater did not convey a personal desire by the judge to impose a prison sentence, as the judge's clear statement did in *Gudgeon*, but was simply a part of the judge's overall "words of caution" upon learning that LaRose did not yet have a felony conviction.

¶37 Furthermore, the dated 2009 comments lack any clear connection to the comments made in this case. It is clear that the circuit court judge did not have those comments in mind during the sentencing in this case, given that he never referenced them. The judge only remembered possibly prosecuting LaRose in the past, and he did not recall presiding over the 2009 case until he read the postconviction motion. In contrast, the comments and the eventual sentences in *Goodson*, *Lamb* and *Marcotte* occurred within a short span of time and show a clearer connection between the comments and the eventual sentences. The judges in those cases dealt with, for the most part, the same crime for which the judge addressed the defendant prior to ordering probation (or hearing sentencing arguments in *Lamb*) and when imposing a sentence upon revocation of that probation. Conversely, in this case, the judge made his 2009 comments with respect to a much different crime than the one LaRose committed in this case.

¶38 In sum, the circuit court judge's 2009 comments are nothing like those made in *Gudgeon*, *Goodson*, *Lamb* or *Marcotte*. They were indefinite admonitions from many years prior that lack any connection to the sentencing in this case. Thus, LaRose has not met his burden to rebut the presumption that the judge acted fairly,

17

impartially, and without bias, as the judge's 2009 comments did not give rise to a serious risk of actual bias.

## II. The Circuit Court Judge's Independent Investigation of LaRose's Criminal History

¶39    LaRose next argues that the circuit court judge's review of LaRose's juvenile record and adult criminal record, together with his failure to notify the parties of his investigation and give the parties an opportunity to respond to the facts the judge obtained from his investigation, gave rise to a serious risk of actual bias. LaRose contends that a comment from SCR 60.04(1)(g) and two judicial discipline cases—*Judicial Commission v. Piontek*, 2019 WI 51, 386 Wis. 2d 703, 927 N.W.2d 552, and *Judicial Commission v. Calvert*, 2018 WI 68, 382 Wis. 2d 354, 914 N.W.2d 765—"demonstrate the error [of the judge's] ways [in the present case], and they make clear that judicial neutrality requires abstaining from independent factual investigation."

¶40    We conclude that the mere fact the circuit court judge conducted an independent investigation of LaRose's criminal history is insufficient to rebut the presumption that the judge acted fairly, impartially, and without bias under the circumstances. We do so primarily because the information the judge noted in his sentencing comments was referenced in the PSI, and LaRose did not—and does not—argue that the information in the PSI was inaccurate. Under these circumstances, the judge's failure to follow the rule that "[a] judge must not independently investigate facts in a case and must consider only the evidence presented," SCR 60.04(1)(g) (cmt),[6] is materially different from the judges' failures

---

[6] The rule itself provides that, with certain exceptions, a judge cannot "initiate, permit, engage in or consider ex parte communications concerning a pending or impending action or proceeding." SCR 60.04(1)(g).

to follow that rule in *Piontek* and *Calvert*, which gave rise to a violation of SCR 60.04(1)(g) and disciplinary actions.

¶41    In *Piontek*, the judge conducted an independent internet investigation into the defendant's nursing credentials in other states because he believed the defendant had been untruthful to the PSI author. *Piontek*, 386 Wis. 2d 703, ¶16. The judge discovered what he believed to be incriminating information that turned out to be incorrect and he relied on that incorrect information when sentencing the defendant. *Id.*, ¶¶16, 18. When the defendant attempted to explain the information the judge had found, he told the defendant that her "lies" were "getting [her] in trouble" and "that he did not want any further comment from her." *Id.*, ¶18 (alteration in original). Our supreme court concluded that the judge's independent investigation violated his duty of neutrality, stating that "it is clearly improper for a judge to both conduct an independent investigation and to fail to give a party a chance to respond to the judge's misinformed allegations based on that investigation." *Id.*, ¶37.

¶42    Here, unlike the judge in *Piontek*, LaRose does not argue that the circuit court judge found and considered incorrect information regarding his juvenile and adult criminal records when sentencing LaRose. The judge simply recounted the juvenile incident with the teacher, which was information in the PSI that was accurate. In fact, LaRose informed the judge of the county where the incident occurred when the judge stated he could not recall where it had occurred. Thus, there was nothing for LaRose to explain or address when he did not dispute the information in the PSI that was recounted by the judge, unlike the defendant in *Piontek* who sought to explain the inaccurate information that the judge found and relied upon.

¶43    In *Calvert*, a court commissioner conducted an independent investigation into a harassment injunction case by speaking with law enforcement to obtain information about the case prior to the injunction hearing. *Calvert*, 382 Wis. 2d 354, ¶¶6-8.  After denying the injunction, the commissioner informed the parties that he told law enforcement to issue disorderly conduct tickets to both parties if law enforcement were called again by the parties, that the parties would be found guilty of disorderly conduct regardless of fault, and that such finding would be upheld because the commissioner had spoken with both the municipal and circuit court judges.  *Id.*, ¶11.  But the commissioner had not, in fact, told law enforcement or the judges anything.  *Id.*, ¶12.  Our supreme court characterized the commissioner's conduct as "undeniably serious," noting that the commissioner was "far from objective and impartial" because he independently investigated the facts of a pending case, which included engaging in an ex parte communication, and he "lied to the parties in a particularly manipulative manner, falsely claiming that he had communicated with individuals in the judicial and law enforcement systems in such a way that the parties were doomed to failure and future legal troubles should they ever seek additional recourse."  *Id.*, ¶26.

¶44    In this case, LaRose does not argue that the circuit court judge engaged in ex parte communications to obtain information about LaRose's juvenile and adult criminal records, and he does not suggest that the judge manipulated the information he found in a way that disadvantaged LaRose.  Here, the judge simply looked at available court records.  In different circumstances, Wisconsin courts have concluded that a judge's investigation into available court records, such as the ones the judge accessed here, is not improper.  *See* *State v. Throndson*, No. 2020AP1081-CR, unpublished slip op. ¶¶26-27, 29 (WI App July 15, 2021) (concluding that the limited nature of the court's investigation of its own records to

review the charges and dispositions of the defendant's juvenile and adult criminal cases did not show objective bias); *see also State v. Counihan*, 2020 WI 12, ¶¶43, 48, 390 Wis. 2d 172, 938 N.W.2d 530 (concluding that a court can access its "institutional memory" to consider information about sentences imposed in similar cases).

¶45 The circuit court judge's investigation into available court records, while not recommended, was not improper under the circumstances here. After explaining why he had ordered a PSI, the judge informed the parties that he had looked at LaRose's juvenile and adult criminal records. The judge then mentioned only the information provided in the PSI relating to LaRose's juvenile and adult records, *see supra* ¶¶6-7, 12-13, but he made no other comments regarding information that was not in the PSI and that he found in those records. Thus, the judge's comments referenced only information that was available to the parties.

¶46 LaRose does not argue that the information the circuit court judge recounted in his comments about LaRose's juvenile and adult criminal records or the information in the PSI regarding those records are inaccurate. LaRose also does not argue that the judge mentioned information from his independent investigation that was not provided in the PSI and to which he did not have a chance to respond. He simply takes issue with the fact that the judge conducted a separate independent investigation without giving notice to the parties and without giving them a chance to respond. More is required to show a serious risk of actual bias.

¶47 The departure from impartiality and neutrality in *Piontek* and *Calvert* was not due to the judges simply conducting an independent investigation, as the circuit court judge did here, but by their additional conduct based on that independent investigation. Namely, the judge did not allow the defendant to explain

21

the obtained misinformation on which the judge relied in **Piontek**, and the commissioner lied to the parties and manipulated the obtained information to suggest the parties could seek no additional recourse in **Calvert**.

¶48    We agree with LaRose that a sentencing judge must provide the parties with notice and an opportunity to respond when he or she conducts an independent investigation.  Although the better course of action would have been for the circuit court judge to alert both parties of his investigation into LaRose's juvenile record and adult criminal record and give the parties an opportunity to review them prior to sentencing, the mere fact that the judge conducted an independent investigation into what were otherwise plainly relevant facts that were available to the parties, by itself, is insufficient to rebut the presumption of impartiality under these circumstances.

## III. The Circuit Court Judge's Comments on the Divorce and LaRose's Behavior

¶49    Finally, LaRose argues that the circuit court judge's comments on the divorce proceeding he had presided over shortly before LaRose's sentencing and his negative commentary on LaRose's behavior outside of the charged crime showed an "unequivocal antagonism" toward LaRose that gave rise to a serious risk of actual bias.  Specifically, LaRose contends that the judge provided no notice that he would be considering that divorce as an aggravating factor in his sentencing and that it is unclear why the judge considered the woman from the divorce a potential victim when there was no evidence of nonconsensual sex or of LaRose's "sexual appetite" causing her infidelity.  He further asserts that the judge's focus on LaRose's undesirable patterns of behavior and apparent belief that those patterns caused the divorce "betray[ed] an unconstitutional degree of antipathy" toward LaRose.

22

¶50     We conclude that the circuit court judge's comments about the divorce and his overall negative comments about LaRose's behavior did not rise to the level of a serious risk of actual bias. Judicial remarks "that are critical or disapproving of, or even hostile to," a party will not support a showing of bias unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). The judge's comments here do not meet that standard because they were made in the context of the relevant and proper sentencing factors the judge outlined when he began his sentencing remarks—which included LaRose's "undesirable behavior patterns," *see* *State v. Gallion*, 2004 WI 42, ¶43 n.11, 270 Wis. 2d 535, 678 N.W.2d 197—and because they were drawn from the information provided in the PSI and the nature of LaRose's charged offense.

¶51     At the outset, we reject LaRose's contention that the circuit court judge's presiding over the divorce proceeding earlier in the day is an "independent investigation." The judge did not seek to obtain information about the divorce, like the judge in *Piontek* did by doing internet research or like the commissioner in *Calvert* did by communicating ex parte with a third party. The judge merely mentioned he had presided over a proceeding from earlier in the day that just happened to be related to the sentencing at hand. Additionally, both the woman from the divorce and the child that resulted from LaRose's affair with that woman were mentioned in the PSI.

¶52     Furthermore, the circuit court judge discussed the divorce in the context of considering LaRose's undesirable behavior patterns—specifically, his questionable sexual behavior. Importantly, LaRose's overall sexual behavior and self-proclaimed addiction *were* tied to the very offense for which he was being sentenced—sexual assault of a child. The judge noted that LaRose, by his own

admission, had sexual addictions that drove him to be unfaithful to his wife and to "father[] a child with another married woman." The PSI mentioned this information in its discussion of LaRose's family and his sexual behaviors. It was in this context that the judge mentioned he had presided over the woman's divorce, made his comment on the potential effect LaRose's behavior had on that woman's marriage, and wondered whether the woman was also a victim of LaRose's behavior patterns.

¶53    When viewed in a vacuum, the circuit court judge's comments may be seen as irrelevant or gratuitously negative toward LaRose. But when viewed objectively in the context of the offense LaRose committed and the sentencing factor the judge was considering in imposing his sentence for that offense, the judge's comments do not reveal a high degree of antagonism toward LaRose, despite their negativity. Rather, the judge's comments suggested the potential effects on victims of the undesirable pattern of behavior the judge was considering overall, and that behavior pattern's effect on other appropriate sentencing factors the judge was considering.

¶54    Here, the circuit court judge was presented with negative facts regarding LaRose's sexual behavior, which led to LaRose being unfaithful to his wife, to fathering a child with another woman, and, ultimately, to the sexual assault of a child for which he was being sentenced—an assault that, as the judge noted, was not "a one-time thing." Further adding to the negative facts before the judge was LaRose's acknowledgement that the assaults would have continued had the victim not reported them. Thus, the judge was within his bounds to comment on LaRose's sexual conduct as an undesirable behavior pattern and, despite the negativity, his comments did not reveal a high degree of antagonism toward LaRose. The judge simply viewed LaRose's undesirable behavior pattern as negatively affecting LaRose's rehabilitative needs and the judge's consideration of protecting

the public, both proper sentencing factors. *See* WIS. STAT. § 973.017(2)(ad), (ak) (2023-24).

¶55 In sum, the circuit court judge's 2009 comments, his independent investigation of LaRose's juvenile and adult criminal records, and his comments on the divorce proceeding he had presided over are each individually insufficient to show a serious risk of actual bias. Taken together, they are also insufficient to show a serious risk of actual bias. Accordingly, LaRose has failed to rebut the presumption that the judge acted fairly, impartially, and without bias.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.